UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Yvette M. Eldridge,

        Plaintiff,

                              **Hon. Hugh B. Scott**

    v.                         01CV557E

                               **Report
and
Recommendation**

COMMISSIONER OF SOCIAL SECURITY[1],

        Defendant.

Before the Court is the defendant's motion for judgment on the pleadings (Docket No. 6).

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security that plaintiff is not disabled and, therefore, is not entitled to disability insurance benefits and/or Supplemental Security Income benefits.

1

---

[1] For convenience, defendant will be identified by the official title only. See Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g) (action survives despite change in office of Commissioner).

## PROCEDURAL BACKGROUND

The plaintiff, Yvette M. Eldridge ("Eldridge" or "plaintiff"), filed an application for disability insurance benefits on April 7, 1999. That application was denied initially and on reconsideration. The plaintiff appeared before an Administrative Law Judge ("ALJ"), who considered the case de novo and concluded, in a written decision dated August 25, 2000, that the plaintiff was not disabled within the meaning of the Social Security Act. The ALJ's decision became the final decision of the Commissioner on June 15, 2001, when the Appeals Council denied plaintiff's request for review.

## FACTUAL BACKGROUND[2]

The plaintiff was born on February 13, 1967. Eldridge, filed an application for disability alleging disability due to neck, back and shoulder pain, headaches, fibromyalgia, chronic pain syndrome and myofascial pain which resulted from a motor vehicle accident on February 2, 1997 (R. 80-82, 122). Prior to the accident, Eldridge worked as a newspaper distributor for the Buffalo News.

After the accident on February 2, 1997, the plaintiff was seen at Health Care Plan ("HCP"). At that time she was diagnosed as having suffered a cervical strain and a left knee contusion. X-rays of her neck and back were negative. (R. 136). She was seen again at HCP on February 7, 1997. At that time she complained of jaw pain which may have resulted from her

---

[2] References noted as "(R.__)" are to the certified record of the administrative proceedings.

face hitting the steering wheel during the accident.  Eldridge was given pain medication. (R. 138).  She was followed-up at HCP on February 13, 1997.  She complained of continued pain in her jaw. An examination revealed some limitation of her cervical rotation but full range of motion without pain in her left knee.  She was referred for physical therapy and advised to stay off work for two weeks. (R. 139).  At a February 21, 1997 appointment at HCP, Eldridge complained of continued headaches that had worsened since her last visit.  The progress notes reflect that she was already in physical therapy and was receiving acupuncture for pain in her right TMJ. These therapies were continued and she was referred for a CT scan of her head. She was given a note to continue off work until March 14, 1997 (R. 140). The CT scan was negative. (R. 141).

In March 1997, plaintiff stated that physical therapy had improved her neck pain but not her headaches (R. 141, 258) . She complained of buckling in her left knee. Her neck demonstrated slightly limited left lateral rotation but, otherwise, had full and painless range of motion. Her left knee moved in all directions without pain. The clinical assessment was improving whiplash injury and probable left knee patellalgia.  She was to continue with physical therapy, take Tylenol with Codeine and do exercises (R. 141). On June 5, 1997, Eldridge advised her HCP care giver that her neck pain was somewhat better (R. 143). She now complained of right shoulder pain (R. 143). Plaintiff had full movement in her cervical spine. Her right shoulder demonstrated full, painless range of motion. She had pain over her right trapezius muscle with trigger points. Plaintiff was given shoulder exercises and a note to remain out of work through July 1997 (R. 143).

Plaintiff underwent physical therapy thirty-four times between February 17 and June 25, 1997 (R. 172-80, 195-202, 237-38). Her neurological status was grossly intact (R. 237). With therapy, plaintiff reported decreased pain in her cervical and lumbosacral spine (R. 172-73, 175, 177, 180). Cervical mobility was normal on most occasions (R. 172-73, 176-77, 179-80).

Plaintiff underwent a neurological examination with Dr. David Hoffman on March 18, 1997 (R. 183-87, 330-31, 336-40). Dr. Hoffman found that Eldridge's range of motion in her neck and shoulders was full; her radial and pedal pulses were equal and full; straight leg raising was unrestricted; cranial nerve testing was normal; muscle strength, sensation, and deep tendon reflex tests were all normal. (R. 186). Plaintiff had no Romberg's Sign. An electromyography ("EMG") of plaintiff's upper extremities was negative. Dr. Hoffman found no sign of neuromuscular disturbance; no evidence of right or left carpel tunnel syndromes or thoracic outlet syndrome. In addition, Dr. Hoffman observed no denervation in right and left C5-8 innervated musculature (R. 186). Dr. Hoffman concluded that he could find no signs of an underlying structural central nervous system or peripheral neuromuscular disturbance. (R. 186).

Plaintiff also had a neurological examination with Dr. Joseph Tutton on April 10, 1997 (R. 188-91). He noted that her cranial nerve functions were normal; neck movements were full without pain; there was minimal cervical tenderness on palpation, and no spasm; pulses in both wrists were normal, even with changes in position; her lumbar spine had good range of motion; she was able to rise on her heels and toes without difficulty. (R. 190). Dr. Tutton found that plaintiff's strength, tone, coordination, reflexes and sensory function were normal in both her upper and lower extremities. He concluded that Eldridge had a post-concussion syndrome and symptoms of cervical and lumbar strain (R. 190). He stated that he did not believe that Eldride

was capable of performing her newspaper delivery work at that time. Dr. Tutton estimated that treatment would continue for "another month or two and that she may have sufficient resolution of symptomatology and could return to work." (R. 191).

Dr. Robert Smolinski, an orthopedist, treated plaintiff between April 15, 1997 and March 3, 1998 for her left knee pain (R. 162-63) . The initial examination revealed normal range of motion in her left knee with a mild degree of patellofemoral crepitus (R. 192). The ligaments were normal. The patella had a mild lateral tilt. Dr. Smolinski's impression was chondromalacia of the patella, status post contusion. He prescribed physical therapy (R. 192). Follow-up examinations were normal but plaintiff continued to complain of pain (R. 193-94) . She was tender over the medial plica region and the medial joint line. Quadriceps atrophy was minimal (R. 194). A magnetic resonance image ("MRI") of the left knee was essentially unremarkable except for a mild degree of mucoid degeneration of the lateral and medial meniscus without evidence of a tear (R. 212). Dr. Smolinski diagnosed a possible medial plica and injected plaintiff's knee (R. 213) . A subsequent examination revealed tenderness and a patellar click but no significant compression pain (R. 153) . There was no effusion or ligament abnormality. Plaintiff's gait was mildly antalgic. Since she continued to have pain, Dr. Smolinski performed an arthroscopy with excision of the medial plica on December 29 (R. 152, 170-71, 285-313) . By March 3, 1998, plaintiff told the doctor that she and her physical therapist both felt that she was eighty percent improved following surgery (R. 149) . Flexion and extension in her left knee were nearly full. Plaintiff's wounds were well-healed and there was no significant quadriceps atrophy. Dr. Smolinski released her to all activities regarding her knee (R. 149).

Dr. Ronald Santasiero, a Chiropractor, treated plaintiff from December 19, 1996 to September 11, 1997 (R. 706-43). She had been seeing Dr. Santasiero since a previous motor vehicle accident in late 1995. (R. 743). On February 10, 1997, plaintiff complained of pain in her jaw, neck and lower back from the accident (R. 706). In plaintiff's neck, side rotation was painful but she accomplished full flexion and extension. Her lumbar spinal flexion was full with some tenderness. Dr. Santasiero thought that plaintiff's accident had exacerbated symptoms in her neck from the previous collision and that her lower back symptoms were myofascial. He recommended weekly acupuncture (R. 706).

Eldridge continued to see Dr. Santasiero several times a month. According to Dr. Santasiero's progress notes, examinations showed that her shoulder and jaw pain were improving (R. 709). She had been exercising and attending physical therapy. Cervical range of motion was good. Dr. Santasiero stated that plaintiff was doing much better (R. 709). Examinations from March, April and May showed good movement in her cervical spine (R. 711, 714-15). Plaintiff confirmed that her neck was doing well (R. 714). Dr. Santasiero stated that plaintiff had trapezius spasm, but not cervical disc disease (R. 713) and noted trigger points in her back (R. 711-12, 714-15, 717, 718). An examination in June of 1997 revealed that right cervical rotation and extension were full, while left rotation caused pain (R. 718). Plaintiff's upper extremities were neurologically intact. Dr. Santasiero said that plaintiff probably would not be able to return to work until August. He encouraged her to continue lifting fifteen to twenty pounds at home, and then slowly increase the weight (R. 718).

Dr. David Bagnall treated plaintiff between August 4, 1997 and April 20, 1998 for shoulder and back pain (R. 147-48, 155-56, 169, 203-09, 225-26, 233-34, 404-07, 462-63, 493,

6

512-13, 524-25, 545-54, 576). The initial examination revealed normal standing balance (R. 204). Plaintiff had limited motion in her lumbar and cervical spine. Shoulder abduction was reduced only slightly. Motor, sensory and reflex examinations were normal. There was significant muscle tightness in plaintiff's neck. She had no significant cervical segmental dysfunction. Dr. Bagnall's impression was: cervical acceleration/deceleration syndrome; thoracic and sacroiliac segmental dysfunctions; chronic pain syndrome; and, non-restorative sleep (R. 204).  An x-ray of plaintiff's lumbar spine on August 26, 1997 was normal (R. 208). A CT scan of her lumbar spine showed a mildly bulging disc at L4-5 (R. 208). An MRI of plaintiff's cervical spine was negative for abnormality (R. 209).

    Dr. Bagnall's notes reflect consistently normal motor, sensory and reflex examinations (R. 148, 155, 169, 233-34).  Plaintiff had good range of motion in both upper extremities (R. 234). Her neck moved normally (R. 155). According to Dr. Bagnall, Eldridge's lumbar motion was limited by twenty-five percent (R. 155, 169) . She had normal cervical, thoracic and lumbar curvature (R. 155) . Dr. Bagnall was concerned that plaintiff was not progressing despite the efforts of many clinicians and that there might be a "behavioral aspect" to the case (R. 233) . On November 24, 1997, Dr. Bagnall examined Eldridge once more.  His notes from that date reflect that he had been "quite frank with Ms. Eldridge." He stated that he saw "no objective reasons for her ongoing discomfort" and that he did not "see any objective reasons why she can't get back to her normal duties, including her job for the Buffalo News." (R. 169) . At plaintiff's final visit, Dr. Bagnall stated that she had no significant disability (R. 155). He said that he could not find any objective reasons for her ongoing discomfort (R. 155).

Dr. Pratbha Bansal treated Eldridge for headaches, neck and shoulder pain between June 9, 1998 and May 16, 2000. (R. 160-61, 596-627, 679-80, 784-848). At her first visit, Dr. Bansal examined Eldridge and found a normal gait; no difficulty walking on toes and heels; a paravertebral muscle spasm; a reduced range of motion in the lumbar spine, some restriction in her neck flexion; sensory, motor and deep tendon reflexes were normal. Dr. Bansal diasgnosed myofascial pain and gave plaintiff trigger point injections. She noted that Eldridge ambulated better after the injections. (R. 161). Thereafter, Eldridge received weekly trigger point injections from Dr. Bansal. (R. 596, 598-16, 622-23). In response to the question: "Is patient now totally disabled?," Dr. Bansal checked the "yes" box on an "Attending Physician's Statement of Disability" form dated January 11, 1999. (R. 680). In subsequent treatments with Dr. Bansal, Eldridge reported that her condition improved. (R. 598, 602, 605, 607-10, 612-16).

Eldridge advised Dr. Bansal that she was yet another automobile accident on May 26, 1999 which aggravated her symptoms. (R. 619). Eldridge continued to treat with Dr. Bansal over the next year. On May 16, 2000, Eldridge asked Dr. Bansal if she could try neurontin which Eldridge had read about. Dr. Bansal stated that she was "agreeable for a trial." (R. 847).

Dr. John Weisberg provided chiropractic care between December 22, 1998 and October 19, 1999 (R. 628-67, 681-85) . An x-ray of plaintiff's cervical spine dated December 22, 1998 was normal except for reduced curvature and sublaxation at C4 and C6 (R. 657) . An x-ray of her lumbar spine revealed no abnormalities (R. 658) . X-rays from June 7, 1999 were negative (R. 648) . Thermal scans and paraspinal electromyography ("EMG") studies were abnormal (R. 636-39 640-43) . Assessing plaintiff's physical capacity, the chiropractor opined that she could sit, stand, and walk one to two hours each and could not lift any weight (R. 666). In a letter dated

March 21 1999, Dr. Weinberg stated that "given that Eldridge has been under medical care with limited success for some two plus years it is doubtful that she will fully recover." (R. 685). He found that Eldridge suffered from chronic fibromyalgia, chronic disc disease, chronic facet syndrome, and chronic vertebral subluxation complex. In his letter, which was addressed to Dr. Pratbha Bansal, Dr. Weinberg stated, "I agree with you that Yvette Eldridge is totally disabled as a result of this auto accident and should remain under yours and my treatment until all efforts to assist her back to a position of greater health and ability are realized or exhausted." (R. 685).

Dr. Paul Fazekas evaluated the plaintiff's psychological state in a consultative examination on July 2, 1999. He found the plaintiff's attention span and immediate memory were in the low average range. Her concentration was well in th average range. According to Dr. Fazekas, her mood was subdued and dysphoric; her affect was appropriate relative to the situation she was experiencing. Eldridge complained of sleep disturbance, fatigue and difficulty concentrating. Dr. Fazekas concluded that Eldridge "presented a reliable picture of her current condition and malingering is not suspected." (R. 700). His impression was that Eldridge suffered from a mood disorder due to chronic pain with major depressive-like episode. (R. 700). Finally, Dr. Fazekas opined that Eldridge "would, in all likelihood, be seriously compromised in any work related activity." (R. 701).

At the hearing before the ALJ, Eldridge testified that she could only sit for half an hour because it caused stiffness and pain in her back. She testified that she relieved the pain by getting up and waking around or by lying down. (R. 42). She estimated that she could lift five pounds, but that she could not push or pull with her right arm. (R. 53). Describing her day, Eldridge testified that she got her children off to school, performed stretching exercises, drove

9

herself to her doctor's appointments (R. 43-44). She was able to clean her house and run errands "on a good day." (R. 43). She grocery shopped each week and cooked for her family (R. 45).

## DISCUSSION

The only issue to be determined by this Court is whether the ALJ's decision that the plaintiff was not under a disability is supported by substantial evidence. See 42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. National Labor Relations Bd., 305 U.S. 197, 229 (1938)).

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

The plaintiff bears the initial burden of showing that his impairment prevents him from returning to his previous type of employment. Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.

1982).  Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative  substantial gainful work which exists in the national economy and which the plaintiff could perform."  Id.; see also Dumas v. Schweiker, 712 F.2d 1545, 1551 (2d Cir. 1983); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).

In order to determine whether the plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

> (1) whether the plaintiff is currently working;
>
> (2) whether the plaintiff suffers from a severe impairment;
>
> (3) whether the impairment is listed in Appendix 1 of the relevant regulations;
>
> (4) whether the impairment prevents the plaintiff from continuing his past relevant work; and
>
> (5) whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; Berry, supra, 675 F.2d at 467.  If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).  However, it should be noted that the ALJ has an affirmative duty to fully develop the record.  Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972).

In order to determine whether an admitted impairment prevents a claimant from performing his past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work he has done in the past.  20 C.F.R. §§ 404.1520(e) & 416.920(e). When the plaintiff's impairment is a mental one, special "care must

be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work." See Social Security Ruling 82-62 (1982); Washington v. Shalala, 37 F.3d 1437, 1442 (10th Cir. 1994). The ALJ must then determine the individual's ability to return to his past relevant work given his residual functional capacity. Washington, supra, 37 F.3d at 1442.

In the instant case, the ALJ determined that the plaintiff's impairments were severe but that they did not meet the listings in Appendix I. (R. 16). The ALJ further found that Eldridge could not return to her previous work as a newspaper distributor, but that she maintained the residual functional capacity to preform light work as defined in 20 C.F.R. §404.1567. (R. 20-21). The ALJ stated that he refused to accept Dr. Weisberg's opinion that Eldridge was totally disabled because it was not supported by the medical evidence in the record. (R. 19). The ALJ noted that Dr. Weisberg, as a chiropractor, is not an acceptable medical source under 20 C.F.R. §404.1513. The ALJ also stated that he gave little weight to Dr. Fazekas's opinion that Eldridge would be seriously compromised in any work related activity. The ALJ noted that Dr. Fazekas's opinion, was not supported by medical evidence, nor was it supported by Dr. Fazekas's own evaluation. (R. 19-20). Finally, the ALJ found Eldridge's subjective complaints of pain to be incredible. (R. 20).

Section 404.1567(b) defines light work as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking

or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

The plaintiff contends that she cannot perform light work. The plaintiff points primarily to the medical notes of Dr. Bansal, Dr. Weisberg, and Dr. Fezakas. In addition, the plaintiff cites to her testimony at the administrative hearing. (Docket No. 10 at pages 1-3 unnumbered). The plaintiff fails to present any legal authority in opposition to the instant motion.

The defendant asserts that the aggregate clinical findings overwhelmingly substantiate the ALJ's finding that the plaintiff was not disabled. The defendant points to the fact that Eldridge's neurological signs were normal at every single examination in the record. The defendant contends that the absence of negative neurological findings is critical inasmuch as someone suffering from a disabling musculoskeletal impairment would be expected to demonstrate decreased sensation, absent reflexes, and diminished motor strength. The defendant points to the fact that the clinical evidence in the record demonstrates that plaintiff's fibromyalgia and neck, shoulder and back pain were not so disabling as to preclude her from all work activity.

As determined by the ALJ, the record in this case supports a finding that the plaintiff suffers from a severe impairment including pain in her head, neck, back and shoulders. The record is mixed as to the severity and debilitating nature of that pain. As discussed above, much of the clinical evidence, including the reports of Dr. Bagnall, support the ALJ's determination. At the same time, the ALJ's decision does not discuss Dr. Bansal's January 11, 1999 opinion that

the plaintiff was totally disabled. Although it is not clear from the record whether Dr. Bansal intended this comment to reflect a permanent disability on the part of the plaintiff, the ALJ failed to adequately explain his basis for discounting this opinion in his decision. In any event, the Court finds that the ALJ's determination is not supported by substantial evidence in the record inasmuch as ALJ rejected the opinion of Dr. Fazekas without adequately developing the record as to any emotional or non-exertional impairments suffered by the plaintiff. The Court notes that Dr. Fazekas examined the plaintiff as a consultant to the Commissioner and determined that she suffered from a mood disorder and a depressive-like episode. Contrary to the defendant's argument, Dr. Fezakas's opinion is not inconsistent with the medical evidence in the record. The ALJ failed to develop the record to determine the severity of any emotional impairment suffered by the plaintiff. Moreover, the ALJ failed to obtain testimony from a vocational expert as to what extent, if any, the non-exertional conditions noted by Dr. Fezakas would impact Eldridge's ability to perform a full range of light work and/or sedentary work. This matter should be remanded to the Commssioner for further proceedings. Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004)(the ALJ failed to develop the record as to whether claimant's nonexertional limitations preclude him from performing other work in the national economy by neglecting to consult a vocational expert).

**CONCLUSION**

For the foregoing reasons, this Court recommends that the decision of the Commissioner be vacated and this matter remanded to the Commissioner for further proceedings.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy to the Report & Recommendation to all parties.

**Any objections to this Report & Recommendation *must* be filed with the Clerk of this Court *within ten (10) days* after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72.3(a).  Failure to file objections to this report & recommendation within the specified time or to request an extension of such time waives the right to appeal any subsequent district court's order adopting the recommendations contained herein.**  Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on *de novo* review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be

supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

So Ordered.

s/HBS<br>
Hon. Hugh B. Scott<br>
United States Magistrate Judge

Buffalo, New York<br>
February 3, 2005